IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

JACOB CREESE,

     Plaintiff,

vs.

BALD EAGLE TOWING &
RECOVERY, DEWAYNE GRUBER,
JR., BUDDY HAGER, and DANIEL
POPOFF,

     Defendants.

Case No.: 2:19-cv-626-SPC-MRM

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND INCOPORATED MEMORANDUM OF LAW

Pursuant to Federal Rule of Civil Procedure 56, Defendants BALD EAGLE TOWING & RECOVERY, INC., DEWAYNE GRUBER, JR., BUDDY HAGER, and DANIEL POPOFF ("Defendants" or "Bald Eagle") move for summary judgment on all claims asserted by Plaintiff JACOB CREESE ("Plaintiff" or "Creese") in the Amended Complaint [Doc. 26]. Alternatively, Defendants move for partial summary judgment on Plaintiff's claim that his "on-call" time is compensable under the Fair Labor Standards Act ("FLSA"). Summary judgment should be granted for the following four reasons:

1.     Plaintiff did not meet his burden under FLSA to show the amount and extent of alleged overtime by just and reasonable inference.

2.     Plaintiff was exempt under the Motor Carrier exemption.

3.     Plaintiff's on-call time was not compensable under the FLSA.

4.      Plaintiff's claim for vacation pay fails because he was not employed in September 2019, his work date anniversary, a condition to earning vacation pay.

## INTRODUCTION

This case serves as an example of why a plaintiff in an FLSA bears the burden to prove both that he performed work for which he was not properly compensated **and** the nature and amount of that work as a matter of just and reasonable inference. Here, even using a relaxed standard, Plaintiff has not met his burden. For all 147 workweeks of his employment, without exception, Plaintiff claims 132 hours of compensable time every week, with 92 overtime hours. Although Plaintiff calls this as an "estimate" in his interrogatories and deposition testimony, it's nothing more than an arbitrary math equation used to achieve an unintended result — an exorbitant FLSA claim where he seeks more than $1 million (liquidated). Plaintiff makes no attempt to use any benchmark for his claim. Plaintiff's "evidence" is based on the number of hours in a day, or a week, not any reasonable measuring stick for a jury to make a conclusion of the number of hours by just and reasonable inference. Thus, Plaintiff has failed to meet his burden and summary judgment should be granted for the Defendants.

Plaintiff is also exempt from overtime under the federal Motor Carrier exemption. Plaintiff worked for Defendant Bald Eagle as a heavy-duty tow truck driver. As a heavy-duty tow truck driver, Plaintiff towed out of state commercial motor vehicles engaged in interstate travel. Because Plaintiff towed a significant number of

commercial motor vehicles during their current stream of interstate travel, he is exempt under the Motor Carrier exemption.

Plaintiff was one of eight "heavy-duty" on-call drivers. He claims all time spent on call is compensable, regardless of whether he was working. Plaintiff claims time he spent at home, engaged in personal activities, and even sleeping is compensable. Plaintiff's on-call time is not compensable and summary judgment should be granted for the Defendants.

## STATEMENT OF UNDISPUTED FACTS

1.  Mr. Creese claims unpaid overtime and minimum wages for all 147 workweeks of his employment, from September 3, 2016 to June 28, 2019. [Doc. 13, FLSA Court Interrogatories].

    **Motor Carrier Exemption**

2.  Bald Eagle Towing and Recovery is registered with the United States Department of Transportation (USDOT # 2196348) as a For-Hire Motor Carrier, intrastate only, authorized to carry other motor vehicles as cargo. [Gruber Dec. ¶ 3; Exh. 1 to Gruber Dec., Bald Eagle USDOT Company Snapshot].

3.  In addition to light and medium vehicles, Bald Eagle's business involves heavy-duty towing and related services for registered USDOT interstate motor carriers and commercial motor vehicles travelling through Florida from outside of the state. [Gruber Dec. ¶ 4].

4.      For all 147 workweeks, Mr. Creese was employed as a heavy-duty driver. Mr. Creese testified he towed heavy trucks, commercial trucks, 18-wheelers, dump trucks, box trucks, and anything outside of what would be considered a personal vehicle. [Creese 17:17-21].

5.      During Plaintiff's 147 workweeks, there were seven other heavy-duty drivers. [Popoff 53:8-22; Gruber 41:7-42:4].

6.      The trucks used for heavy-duty towing, and those operated by Mr. Creese, were commercial motor vehicles regulated by the USDOT with a Gross Vehicle Weight Rating exceeding 26,000 lbs. Because of this, Mr. Creese and the other heavy-duty drivers were required to have a CDL license, and comply with other USDOT regulations applicable to intrastate commercial motor vehicles. [Gruber Dec. ¶ 6].

7.      During the 147 workweeks, Bald Eagle arranged or contracted with national motor clubs to provide towing and roadside services to commercial vehicles travelling to Florida from outside of the state, including Agero, Allstate, Ari Fleet, Coach-Net, Cruise America, Fleet Net America, Geico, INA/Interstar, Penske, Pepsi, Road America, Transit Pros, TTN, and UHaul. Commercial motor carriers are members and pay fees to the motor clubs for their commercial motor vehicles to receive tow and roadside services while engaged in interstate travel. Bald Eagle prearranged and agreed to provide those services for interstate motor carriers whose commercial motor vehicles were travelling to and from Florida. [Gruber Dec. ¶ 7].

8.     In addition to the above arrangements with interstate motor carriers, Bald Eagle regularly received calls for service of out-of-state commercial vehicles. [Gruber Dec. ¶ 8].

9.     As a routine practice, Bald Eagle maintains records of the vehicle and its license plate information. Therefore, Bald Eagle was able to determine the percentage of commercial motor vehicles that Mr. Creese towed that were registered outside of the state of Florida. [Gruber Dec. ¶ 8].

10.    During the 147 workweeks, Mr. Creese towed 467 commercial vehicles registered out-of-state, which amounts to 7% of the total vehicles that Mr. Creese towed. [Gruber Dec. ¶ 9; Popoff 28:4-25, 29:1-25; Exh. 3 to Popoff Depo].

11.    On 68 occasions, Mr. Creese towed rental cargo vehicles registered out-of-state. [Gruber Dec. ¶ 10]

**Plaintiff's FLSA Claims**

12.    Mr. Creese's claim encompasses 147 workweeks (September 3, 2016 to June 28, 2019). [Doc. 13].

13.    During the first 41 workweeks (Sept. 3, 2016 – June 16, 2017), Bald Eagle paid Mr. Creese a 30% commission. [Doc. 13]. For the remaining 106 workweeks (June 16, 2017 – June 28, 2019), Bald Eagle paid Mr. Creese a salary of $1,300 per week. [Doc. 13].

14.   In his FLSA Court Interrogatories, Mr. Creese estimates 132 total compensable hours per week, with 92 overtime hours per week. Mr. Creese makes this identical estimate for all 147 workweeks of his employment. [Doc. 13].

15.   When asked at his deposition, Mr. Creese was unable to provide any additional information about the nature and extent of his alleged overtime hours. [Creese 193:5-18; 195:7-14].

16.   For all 147 workweeks, Bald Eagle created and maintained electronic records in a software dispatch program called Beacon. Among other information, the Beacon records show: (1) the date and time the call was received by dispatch; (2) the time the call was assigned to a driver; (3) the truck identification number for the driver; (4) the driver's departure time; (5) the time the driver arrived on scene; (6) the time the driver departed the scene; (6) the time the driver arrived at the customer's destination; (7) the time the driver completed the call; (8) the customer's contact information; and (9) the vehicle license plate. [Gruber Dec. ¶ 16].

17.   In addition to the Beacon records, Defendant maintained GPS records of the trucks assigned to Mr. Creese. [Gruber Dec. ¶ 12].

18.   The GPS records show: (1) starts, (2) stops, (3) idles, and (4) address and location for all movements. [Gruber Dec. ¶ 13].

19.   Bald Eagle also produced the phone records of Mr. Creese. The cell phone records show Mr. Creese's outgoing and incoming calls and their duration. [Gruber Dec. ¶ 14].

20.   Mr. Creese did not have a schedule. Instead, he was on call. [Popoff 56:4-8]

21.   Mr. Creese contends that he had a schedule of 24 hours per day, 7 days per week, because he was "on call." [Doc. 3, FLSA Court Interrogatories, No. 3].

22.   During the 147 workweeks, Bald Eagle had a routine business practice for receiving and dispatching customer calls for tow services. All calls were received by a dispatcher. The dispatcher routed the towing assignment to a driver. If that driver was not available for any reason, the call was routed to the next available driver. [Gruber Dec. ¶ 15].

23.   During the 147 workweeks, the following individuals were all "heavy-duty" drivers available to accept calls: Jacob Creese (Plaintiff), Bud Gruber, Steve Gruber, Daniel Lott, Carl Clark, Ari "Taylor" Lee, Carlos Rodriguez, and Frank Gentlecourt. [Gruber 41:7-42:4]

24.   Mr. Creese did not have restrictions during on-call time other than to arrive at the call within a reasonable amount of time. [Creese 161:21-162:21; 163:2-6; Popoff 63:4-10].

25.   Mr. Creese could spend time with his family, grocery shop, eat, sleep, relax, and devote time to his singing interests. In fact, Mr. Creese posted approximately 135 music videos on social media during the relevant period. [Creese 70:16-20; 74:18-25; 84:15-19].

26.   Mr. Creese asserts that Monday through Friday from 7:00am to 5:00pm he was expected to be in the "general vicinity" of the shop during those hours. After 5:00pm, Mr. Creese would head home. [Creese 49:24-50:8; 51:4-11.]

27.   However, GPS records show Mr. Creese at home during those hours on 216 occasions. [Gruber Dec. ¶ 19; Exh. 2 to Gruber Dec.].

28.   Mr. Creese was not required, nor encouraged to be at the Bald Eagle shop. [Gruber Dec. ¶ 17].

29.   Mr. Creese testified he was not in or around the shop on Saturday and Sundays. [Creese 161:4-15].

30.   Mr. Creese was generally home 8 hours on Saturday and 12 hours on Sunday. [Creese 184:9-12; 187:9-11].

31.   As a salaried employee, Mr. Creese's pay was not impacted if he turned down towing opportunities. [Gruber Dec. ¶ 20].

## MEMORANDUM OF LAW

## I.   SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of stating the basis for its motion and identifying those portions of the record demonstrating the absence of genuine issues of material fact. *Celotex*, 477 U.S. at 323; *Hickson Corp. v. N. Crossarm Co., Inc.*, 357 F.3d 1256, 1260 (11th Cir. 2004). That burden can be discharged if the moving party can show the court that there is "an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.

When the moving party has discharged its burden, the nonmoving party must then designate specific facts showing that there is a genuine issue of material fact. *Id.* at 324. Issues of fact are genuine only if a reasonable jury, considering the evidence present, could find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). If the non-movant's response consists of nothing "more than a repetition of his conclusional allegations," summary judgment is not only proper, but required. *Morris v. Ross*, 663 F.2d 1032, 1034 (11th Cir. 1982).

## II.    PLAINTIFF'S BURDEN OF PROOF

An employee bringing an FLSA claim for unpaid overtime wages initially bears the burden of proving that he performed work for which he was not properly compensated. *Estrada v. FTS USA, LLC*, 688 F. App'x. 830 (11th Cir. 2017) (affirming summary judgment for defendant). When an employer has failed to keep records or the records cannot be trusted, this burden of proving work without proper compensation is "relaxed." Under such "relaxed" circumstances, an employee satisfies his burden "if he proves that he has in fact performed work for which he was improperly compensated" and he "produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." *Id*.

However, even applying the relaxed burden, the plaintiff must offer more than vague and contradictory assertions regarding the work for which he was allegedly not paid. *Id*. at *31. If an employee cannot offer convincing substitutes for the employer's records, then the employee must produce sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference. *Morgan v. Kalka & Baer*

*LLC*, 750 F. App'x. 784, 790 (11th Cir. 2018) (finding plaintiff failed to meet her burden because she produced no evidence of the emails or mileage statements, she relied on to claim she worked 140 unpaid hours, nor did she produce any evidence suggesting those 140 hours were worked more than the 40-hour workweek); *see also Gilson v. Indaglo, Inc.*, 581 F. App'x. 832 (11th Cir.2014) (finding plaintiffs failed to meet their burden where one plaintiff testified to working 52-54 hours per week and the other testified to working 50-60 hours per week, but neither could recall the hours worked in any week).

Here, Defendant maintained detailed records of the work performed by Plaintiff, including tow records, GPS records, and phone records. Plaintiff argued, with no factual support, that Defendant's records were inaccurate. Even if Plaintiff could apply the "relaxed" burden, Plaintiff failed to produce sufficient evidence supporting a just and reasonable approximation of his undercompensated work. Plaintiff estimated working 132 hours every week without exception, even for weeks he performed no towing services. [Creese 131:20-132:21, 133:6-14]. To be sure, he claimed overtime for weeks in which he had no emergencies or after hour responsibilities. [Creese 157:1-159:7]. Instead, Plaintiff estimated his hours worked based on all hours in the day except for an arbitrary number of hours for sleeping. [Creese 141:5-25; 143:14-20]. Plaintiff testified, "there's no way to determine exactly the number of hours." [Creese 144:4-6]. Further, Plaintiff acknowledged the days that he was working on calls for extended hours he was already paid, yet he still included those days in his vague estimate. [Creese 144:15-23]. Plaintiff took two days off for his

birthday, yet he still claimed 92 hours of overtime that week. [Creese 152:19-24].

Additionally, Plaintiff concedes that he was not working while he posted his

extraordinary amount of personal music videos, yet he claimed those hours in his

estimate:

> **Q:** Are you seeking time for the time that you were spent posting
> on social media?
>
> **A:** …I did 135 videos over the course of 3 years. I think that
> equates to, like nine hours. Want to deduct nine hours from the
> settlement? Go ahead.

[Creese 74:18-25].

Plaintiff's testimony demonstrates his cavalier approach to his burden.

Throughout this litigation, Plaintiff merely provided a figure with a number of hours.

[Creese 153:1-3; 154:8-12]. He did not base this figure on any actual work performed.

[Creese 160:19-25; 195:7-14]. Plaintiff admitted that he was not working on the

weekends unless he was called in to do something. However, Plaintiff still includes in

his "estimate" that he worked 18-hour days on the weekends. And Plaintiff concedes

that he has no evidence that he was working any such weekends. [Creese 170:12-19;

171:18-24]. The tow records and GPS records contradict Plaintiff's assertions. [Gruber

Dec. ¶ 19]. And Plaintiff's own testimony contradicts his estimates. Plaintiff has

nothing more than vague and contradictory estimates of the time he worked and

absolutely no evidence of the amount and extent of the work he claims in this matter.

Thus, "no reasonable juror could make a just and reasonable approximation of

[plaintiffs'] undercompensated work hours." *Gilson*, 581 F. App'x. 832, 834 (11th

Cir.2014). Regardless of whether the FLSA burden shifting analysis applies, Plaintiff has not met his burden of proof and the court should grant summary judgment in favor of Defendants.

## III.   MOTOR CARRIER EXEMPTION

### A.   Generally

While the FLSA generally requires employers to pay employees at time-and-a-half for any time worked more than forty hours per week, the Act specifically exempts from this requirement "any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service pursuant to the provisions of" the Motor Carrier Act ("MCA"). *Walters v. Am. Coach Lines of Miami, Inc.,* 575 F.3d 1221, 1226 (11th Cir. 2009) (*citing* 29 U.S.C. § 213(b)(1)). The applicability of the motor carrier exemption "depends both on the class to which his employer belongs and on the class of work involved in the employee's job." *Id.* at 1227. Thus, there are two requirements for an employee to be subject to the motor carrier exemption. First, his employer's business must be subject to the Secretary of Transportation's jurisdiction under the MCA. *Id.* (*citing Baez v. Wells Fargo Armored Serv. Corp.*, 938 F.2d 180, 181-82 (11th Cir. 1991). Second, the employee's business-related activities must "directly affect [] the safety of operation of motor vehicles in the transportation on the public highways of passengers or property in interstate or foreign commerce within the meaning of the Motor Carrier Act." *Id.* (*citing Baez*, 938 F.2d at 182; 29 C.F.R. § 782.2(a)).

12

## B.    Secretary Has MCA Jurisdiction over Bald Eagle and Plaintiff's Work-Related Activities

The Supreme Court has previously recognized that tow trucks qualify as "motor carriers" under §14501(c)(1). *Dan's City Used Cars, Inc. v. Pelkey*, 569 U.S. 251, 256 n.1 (2013) (*Columbus v. Ours Garage & Wrecker Service, Inc.*, 536 U.S. 424, 430 (2002)). Further, Bald Eagle's services are subject to the Secretary of Transportation's jurisdiction as Bald Eagle was licensed by the DOT.[1] Additionally, Plaintiff's use of public highways as a driver is sufficient to find that his activities affected the safety of operations of motor vehicles. *See Aira v. Best Nat'l Vending, Inc.*, 2012 U.S. LEXIS 148534, at *27 (as a route driver, plaintiff's activities affected the safety of operations of motor vehicles)(*citing* 29 C.F.R. § 782.2(b)(2)); *Baez*, 938 F.2d at 181-82 (with regard to the effect on safety aspect, driver-helpers satisfy that requirement); *see also Abel*, 631 F.3d 1210 (as a driver, plaintiff engaged in activities that directly affected the safety of operation of motor vehicles in the transportation of passengers on the public highways). As a towing company and a tow truck driver, it is not disputed that the parties' activities directly affect the safety of operation of motor vehicles. Rather, the

---

[1] Even if the Secretary has not in fact exercised jurisdiction, the MCA exemption still applies so long as the Secretary has the authority to do so. *Abel v. Southern Shuttle Servs.*, 631 F.3d 1210, 1213 (11th Cir. 2011); *see also Southland Gasoline Company v. Bayley*, 319 U.S. 44 (1944) (The exemption from the overtime provisions of the Fair Labor Standards Act provided by § 13(b)(1) is not dependent on the exercise of power by the Interstate Commerce Commission. It is only necessary that the I.C.C. have the power).

The ICC is the predecessor of the DOT. The power to regulate safety under the MCA was transferred to the DOT upon its creation in 1966. *Demma v. Chi. 24 Hour Towing, Inc.*, No. 14 C 08911, 2016 U.S. Dist. LEXIS 55073, at *9 n.5 (N.D. Ill. Apr. 26, 2016).

disputed legal issue is whether the parties' purely intrastate activities are sufficient to affect interstate commerce within the meaning of the MCA.

### C.   The Interstate Commerce Requirement is Met

The interstate requirement under the MCA for both employer's business and the employee's business-related activities can be established by the same analysis of purely intrastate transportation. *Abel*, 631 F.3d at 1215-17 (analyzing intrastate travel under employer's business requirement); *Walters*, 575 F.3d at 1226 (analyzing intrastate travel under employee's business-related activities requirement).

Defendant does not dispute that Plaintiff's tows were purely intrastate. However, the Eleventh Circuit has repeatedly held that purely intrastate transportation can constitute part of interstate commerce if it is part of a "continuous stream of interstate travel." *Abel*, 631 F.3d at 1215. Although the MCA and the FLSA do not have identical conceptions of what constitutes interstate commerce, to make enforcement easier, the regulations assume that a movement that would constitute interstate commerce under the FLSA would likewise constitute interstate commerce under the MCA, except in those situations where Secretary holds otherwise. *Walters*, 575 F.3d at 1229.

Courts are "guided by practical considerations" in determining whether activities would be part of interstate commerce for purposes of the FLSA. *Id.* "When persons or goods move from a point of origin in one state to a point of destination in another, the fact that a part of that journey consists of transportation by an independent agency solely within the boundaries of one state does not make that portion of the trip

14

any less interstate in character." *Id*. (*citing United States v. Yellow Cab Co*., 332 U.S. 218, 228 (1947), overruled on other grounds by *Copperweld Corp. v. Independence Tube Corp*., 467 U.S. 752 (1984)). For transportation to constitute a continuous stream of interstate travel, there must be a "practical continuity of movement" between the intrastate segment and the overall interstate flow. *Id*. (*citing Walling v. Jacksonville Paper Co*., 317 U.S. 564, 568 (1943)).

In *Walters*, the Eleventh Circuit held that bus drivers driving purely intrastate were nevertheless exempt under the MCA. The drivers transported passengers from the airport to cruise ships in conjunction with a travel package offered by the cruise line. *Walters*, 573 F.3d 1221. The court found the shuttle services from airport to seaport were part of the continuous stream of the passengers' interstate travel. *Id*. at 1230. Similarly, in *Abel*, the Eleventh Circuit again found shuttle drivers transporting passengers purely intrastate were exempt under the MCA. *Abel*, 631 F.3d 1210. Because the drivers transported passengers to and from the airport, often arranged through website travel packages or upon arrival at the airport, the court found the drivers were transporting people through a continuous stream of interstate travel. *Id*. at 1216.

The Eleventh Circuit relied upon other cases finding intrastate transportation of goods sufficient to meet the MCA requirements when they are part of "a practical continuity of movement of the goods" in interstate commerce. *Id*. at 1215 *citing to Walling v. Jacksonville Paper Co*., 317 U.S.at 568, 63 S. Ct. at 335 (involving wholesale

distributor of paper products made outside the state but transported only to customers within the state); *Baez*, 938 F.2d at 181-82 (involving armored trucks delivering to Florida banks checks and other instruments bound for banks outside Florida); *Galbreath v. Gulf Oil Corp.*, 413 F.2d 941 (5th Cir. 1969) (involving oil company's transport within Georgia of petroleum products originating from refineries in Texas and Mississippi); *Opelika Royal Crown Bottling Co. v. Goldberg*, 299 F.2d 37 (5th Cir. 1962)(involving wholesale soft drink distributor transporting drinks bottled in Georgia from Alabama warehouse to Alabama customers and returning empty bottles to Alabama warehouse, where other trucks took them back to Georgia).

Further, tow truck drivers are a category that expressly meet the MCA requirement no matter how frequently or infrequently the driver crosses state lines; they are covered or not covered as a class or category of employees (drivers) of a motor carrier, based on the "character" of their work, unless it "**never** involves transportation in interstate or foreign commerce within the meaning of the Motor Carrier Act." *Demma v. Chi. 24 Hour Towing, Inc.*, 2016 U.S. Dist. LEXIS 55073, at *14-15 (N.D. Ill. Apr. 26, 2016) (*citing* 29 C.F.R. § 782.3) (emphasis in original)). In analyzing the exemption as applied to tow truck drivers, this district noted that "purely intrastate transportation can constitute part of interstate commerce if 'it is part of a continuous stream of interstate travel,' meaning there is 'a practical continuity of movement between the intrastate segment and the overall interstate flow." *Taylor v. C&L Towing & Transp., L.L.C.,* 2019 U.S. Dist. LEXIS 77793, at *16 n.5 (M.D. Fla. Apr. 23, 2019)

(noting defendant did not raise the intrastate argument and therefore it was not ruled upon).

In a similar case, this district held that a repossession driver operating solely intrastate was exempt under the MCA because in some instances the repossessed vehicles were ultimately destined for out of state. *Giovagnorio v. Am. Recovery Specialists of Orlando, Inc.*, 2011 U.S. Dist. LEXIS 159530 (M.D. Fla. 2011). In *Giovagnorio*, the drivers would retrieve the vehicles in Florida and transport the vehicles to a recovery lot in Florida. At some time after rest at the recovery lot, the repossessed vehicles ultimately went to auction. The court noted that although the defendants did not know the ultimate destination of the repossessed vehicles, they knew that about 20% of all recovered property is transported out of state following the auction. *Id.* In reaching its decision, the court noted that the that lack of knowledge as to the specific, ultimate destination of a good at the time shipment begins in not sufficient to establish that the shipper lacked a fixed and persistent intent to engage in interstate commerce. *Id.* at *18. The court rejected plaintiff's argument that the defendant had insufficient evidence that the final destination of the recovered vehicles was made prior to the repossession assignment. *Id.* at *16. Instead, plaintiff would need to submit specific evidence to refute defendant's evidence. *Id.*

Further, courts have found that an "interruption" or termination of the continuous stream of commerce does not occur merely where there is a pause in transit, but rather when the good is transformed before it reaches its out of state destination. *See Cruz v. Southern Waste Sys., LLC*, 2010 U.S. Dist. LEXIS 5590, at *12

(S.D. Fla. 2010) (no interruption to the continuous stream of commerce where plaintiff delivered goods to vendor in Florida who transported goods across state lines because the goods were not materially changed); *see also Tomlin v. JCS Enterprise*, 13 F. Supp. 3d 1330, 1342 (N.D. Ga. 2014) (rejecting plaintiffs argument that a break in the continuity of interstate commerce occurred when the trailers destined for sale out of state were delivered to the freight terminal and were loaded with the goods of a third-party customer located in the same state).

Approximately 7% of Plaintiff's tows were out-of-state commercial vehicles. *See Abel*, 631 F.3d at 1214 (stating that cases suggest that a company's interstate business is *de minimus* only if it is less than one percent of its trips). In total, Plaintiff towed vehicles with out-of-state license plates on 467 occasions.

On 68 occasions Plaintiff transported rental cargo trucks which are used to transport large amounts of items from one location to another. The record establishes that Plaintiff towed heavy-duty vehicles which are not merely personal vehicles, but rather traveling specifically for the purpose of transporting items.

Further, unlike personal vehicles that may travel across state lines at some point but then remain in Florida for periods of time, commercial vehicles remaining in Florida must obtain special licensing and permitting to remain in Florida. *See* Fla. Stat.§ 320.0715; *see also* https://www.flhsmv.gov/motor-vehicles-tags-titles/license-plates-registration/ (30-day temporary license plates may be issued…for use on a commercial vehicle (heavy truck), even carrying a load, if the vehicle remains in Florida). Therefore, Bald Eagle has a reasonable basis to believe that the out of state

heavy trucks being towed originated out of state and were in the current stream of interstate commerce. Plaintiff has no evidence to refute the origin or destination of the towed vehicles.

Additionally, Bald Eagle contracts with numerous national motor clubs that facilitate services with out of state commercial vehicles. [Gruber Dec. ¶ 11]. Like the passengers in *Abel*, many of the commercial vehicles Plaintiff towed were pre-arranged through third party motor club memberships. While Bald Eagle would not require information about the customers travel plans, by partnering with the national motor clubs, Bald Eagle reasonably believed that many of the customers arranged by these motor clubs were commercial vehicles travelling interstate. And, although roadside assistance is not always a pre-planned event, it is a known occurrence that commercial vehicles may breakdown during long distance travel. Therefore, companies join motor clubs in advance to ensure the goods are transported in a continuous stream without interruption. These facts establish that Bald Eagle is part of the continuous stream of interstate travel of commercial vehicles carrying goods across state lines.

In sum, Plaintiff regularly towed commercial vehicles that were in the process of travelling interstate. As such, the MCA applies to Plaintiff and Plaintiff is exempt from overtime wages.

## IV.    PLAINTIFF'S ON-CALL TIME IS NOT COMPENSABLE

To the extent the Court considers Plaintiff's claims, the Court should find Plaintiff's "on-call" time was not compensable. In analyzing on-call time, the Eleventh Circuit has stated, "it is clear that an employee's free time must be *severely* restricted

for off-time to be constructed as work time for purposes of the FLSA." *Birdwell v. Gadsden*, 970 F.2d 802, 808 (11th Cir. 1992) [emphasis added]. This Circuit reviewed several other cases in reaching this determination.

In *Boehm v. Kansas City Power and Light Co.*, 868 F.2d 1182 (10th Cir.1989), the power company required its linemen to be on-call twenty-four hours a day during storms and emergencies; if the employees were not reachable and did not accept at least one in three calls, they were subject to discipline. *Id*. The Tenth Circuit found that the district court erred in not granting the company's motion for directed verdict and held that the "defendant's call-out policy as written and as applied was not so restrictive that a jury reasonably could conclude that the time was spent predominately for the employer's benefit." *Id*. at 1185. Likewise, in *Norton v. Worthen Van Service, Inc.*, the Tenth Circuit found that even more restrictions on an employees' off-duty time were not compensable. 839 F.2d 653 (10th Cir.1988). In *Norton*, the company required its van drivers to remain near the company premises in case the company needed a driver. The drivers were required to wait during shifts of 8 to 10 hours a day but were "compensated for this waiting time only if they received a call to transport railroad crews within two hours of their last call." *Id*. at 654.

In *Spires v. Ben Hill Cty.*, 980 F.2d 683, 686 (11th Cir. 1993), the Eleventh Circuit found that even though EMTs worked a considerable number of hours on call (eight in a twenty-four-hour period), the conditions placed on them "were not so restrictive so as to preclude them from effectively using the [on-call] time for personal pursuits."

Other courts have reached similar conclusions. The Fifth Circuit held that even though an employee was on-call throughout all his off-duty time, had to report to the hospital within twenty minutes of being called in, and had no days off, his idle on-call time was not compensable. *Bright v. Hous. Nw. Med. Ctr. Survivor, Inc.*, 934 F.2d 671, 676 (5th Cir. 1991). Courts in the Tenth Circuit have also held that where "the limitations were not so onerous that a reasonable factfinder would conclude that they were . . . precluded from effectively pursuing their personal pursuits," the on-call time was not compensable. *OTR Driver at Topeka Frito-Lay, Inc.'s Distribution Ctr. v. Frito-Lay, Inc.*, 1993 U.S. Dist. LEXIS 4468, at *22-23 (D. Kan. Mar. 5, 1993) (citation omitted).

Additionally, the FLSA regulations provide "an employee who is not required to remain on the employer's premises but is merely required to leave word at his home or with company officials where he may be reached is not working while on call." *West v. Southern AG Carriers, Inc.,* 2018 U.S. Dist. LEXIS 240795, at *19-20 (M.D. Ga. 2018) (*citing* 29 CFR §785.17). In *West*, the court held that a tow truck driver's time on-call was not compensable. The court found the fact that the tow truck driver was on-call from home and not at the employer's business significantly cut against a finding that the driver's time was predominating for the employer's benefit. *Id.* at *24. Likewise, the court was persuaded because the tow truck driver presented no facts indicating he was required to stay home or that he was restricted from pursuing personal interests at home. Thus, the court found the tow truck driver was "engaged to wait" rather than "waiting to be engaged." *Id.* at *25.

21

Here, Plaintiff was one of seven heavy-duty drivers available for call. When Plaintiff was not actually towing vehicles, he could do any activities he pleased, but was expected to be available to answer calls for towing services. Plaintiff claims he always had to be near his truck and if he went anywhere with his family, they brought two vehicles. The Eleventh Circuit found this argument unavailing. *See Gladstone*, 970 F.2d at 807 (on-call time not compensable despite find that if the plaintiffs wanted to go somewhere with their family, the family was required to take two cars since the plaintiffs could have been called away at any moment.) Likewise, the courts have repeatedly rejected arguments that the requirement to arrive at work within 20 minutes is severely restrictive enough to require the time to be compensable. *See* e.g., *Bright*, 934 F.2d 671. Therefore, Plaintiff's claim that he had to arrive at the scene promptly after a call is unavailing. Finally, to the extent Plaintiff argues failing to respond to a call would bring negative consequences such as discipline, this too has been rejected. *See* e.g., *Boehm*, 868 F.2d 1182. Plaintiff was free to pursue any activities when not towing. In comparison to other cases finding on-call time not compensable, Plaintiff enjoyed substantially more freedom. He could sing, post music videos, engage with family, travel outside the house, sleep, eat, and was not prevented from pursuing other interests.

To the extent Plaintiff asserts he was working and not merely on call, Plaintiff has the burden to prove the hours worked in which he claims to be uncompensated. *Estrada*, 688 F. App'x. at 830. As such, Defendants is seeking judgment on the narrow issue that Plaintiff's "on call" time is not compensable. The record evidence establishes

that Plaintiff's on-call time is not compensable, and summary judgment should be granted in favor of Defendants.

## V.      PLAINTIFF IS NOT ENTITLED TO VACATION PAY

In Count III of his Amended Complaint Plaintiff asserts he is entitled to accrued vacation pay. Plaintiff cites Fla. Stat. § 448.08 as the basis for his unpaid accrued vacation wages claim. However, § 448.08 does not create or otherwise provide for a cause of action for back wages; it relates instead to payment of attorneys' fees to a prevailing party in an action for back wages. *See Short v. Bryn Alan Studios, Inc.*, 2008 U.S. Dist. LEXIS 42308, at *7-8, 2008 WL 2222319 (M.D. Fla. May 28, 2008) (*citing* Fla, Stat § 448.08 which reads "[t]he court may award to the prevailing party in an action for unpaid wages, costs of the action and a reasonable attorney's fee."). The appropriate basis for Plaintiff's recovery of an unpaid vacation claim would be Florida common law. *Bryn Alan Studios, Inc.*, 2008 U.S. Dist. LEXIS 42308, at *8. While annual vacation pay constitutes wages and compensation for services performed, the payment of accrued vacation pay is an independent contractual right that the claimant and the employer have agreed to as a condition of plaintiff's employment. *See Tomasini v Mount Sinai Med Ctr. Of Fla., Inc.*, 315 F. Supp. 2d 1252, 1258-59 (S.D. Fla. 2004).

Under the terms of the agreement between Plaintiff and Bald Eagle, Plaintiff would be paid $2,600.00 in vacation pay if he took no vacation time during the year. [Exh. 5 to Popoff Depo.]. Plaintiff's vacation time accrued on his anniversary date. [Exh. 5 to Popoff Depo.]. Since Plaintiff began his employment with Bald Eagle on

September 1, 2016, his anniversary date would fall on the first of September in each successive year.

Contrary to Plaintiff's claim, Bald Eagle Towing complied with the terms of their agreement. On November 10, 2017, Plaintiff was paid the $2,600.00 in vacation pay for not taking vacation for the year dating from September 1, 2016 through August 31, 2017. [Creese 16:15-20; Exh. 1 to Creese Depo.]. On November 16, 2018, he was paid $2,600.00 for not taking vacation time for the year dating from September 1, 2017 through September 1, 2018. [Exh. 1 to Creese Depo.] So, the only year at issue here would be the year dating from September 1, 2018 through September 1, 2019.

Pursuant to the agreement, Plaintiff's vacation pay would not accrue until September 1, 2019. Since Plaintiff was terminated on June 29, 2019, prior to his September 1, 2019 anniversary date, he is not entitled to vacation pay for that year. Therefore, Plaintiff is not due $2,600.00 in vacation pay for the year dating from September 1, 2018 through September 1, 2019, and summary judgment should be granted in favor of Bald Eagle on Count III.

## CONCLUSION

For the foregoing reasons, summary judgment should be granted in favor of Defendants and against Plaintiff.

Dated: March 8, 2021

Respectfully submitted,

/s/ Jason L. Gunter
Jason L. Gunter
Fla. Bar No. 0134694
Email: Jason@GunterFirm.com
Conor P. Foley
Fla. Bar No. 111977
Email: Conor@GunterFirm.com
**GUNTERFIRM**
1514 Broadway, Suite 101
Fort Myers, FL 33901
Tel: 239.334.7017

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 8 day of March 2021, a true and correct copy of the foregoing has been furnished by electronic filing with the Clerk of the court via CM/ECF, which will send notice of electronic filing to all counsel of record.

/s/ Jason L. Gunter
Jason L. Gunter