## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## FORT MYERS DIVISION

JACOB CREESE,

   Plaintiff,

v.          Case No: 2:19-cv-626-SPC-MRM

BALD EAGLE TOWING &
RECOVERY, DEWAYNE
GRUBER, JR., BUDDY HAGER
and DANIEL POPOFF,

   Defendants.

_____/

### OPINION AND ORDER[1]

Before the Court is Plaintiff Jacob Creese's Motion for Summary Judgment (Doc. 42).  Defendants Bald Eagle Towing & Recovery, Dewayne Gruber, Buddy Hager, and Daniel Popoff's also filed for summary judgment (Doc. 44).  Creese moved to strike Gruber's declaration too (Doc. 51).  The parties responded to the Motions and then some.  (Docs. 52; 53; 59; 60; 61; 64).

### BACKGROUND

This is a Fair Labor Standards Act ("FLSA") case.  Creese worked for Bald Eagle as a heavy-duty tow truck driver.  This generally entailed

---

[1] Disclaimer: Documents hyperlinked to CM/ECF are subject to PACER fees.  By using hyperlinks, the Court does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide, nor does it have any agreements with them.  The Court is also not responsible for a hyperlink's availability and functionality, and a failed hyperlink does not affect this Order.

responding to calls for roadside services on large vehicles like semi or dump trucks. Bald Eagle provided different services (e.g., tows, jumps start, and lock outs).[2] As Bald Eagle's primary heavy-duty driver, any call for a heavy-duty tow went to Creese first. Because towing work is somewhat unpredictable, calls could come in whenever. Jobs varied in both frequency and time. Some days had no tows, while others had five. And each tow could take anywhere from thirty minutes to fourteen hours.

Apart from his tow calls, Creese had other duties. He communicated with clients, estimated non-roadside jobs, trained coworkers, and worked around Bald Eagle's office (the "Shop"). What's more, Creese worked as a backup driver for tows on light-duty vehicles, such as cars and small pickup trucks. In all, Creese estimates he worked about 132 hours each week (ninety-two overtime hours). Gruber, Hager, and Popoff (together, the "Individuals") owned and operated Bald Eagle during the relevant period.

Creese filed a three-count Complaint—suing for FLSA overtime and minimum wage violations, along with a state-law claim for failure to pay vacation wages. (Doc. 26). Now, each party moves for summary judgment.

---

[2] For ease of reference below, the Court refers to all Creese's calls for service as tows.

## LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And a material fact is in genuine dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The moving party bears the initial burden to show the lack of genuinely disputed material fact. *Shiver v. Chertoff*, 549 F.3d 1342, 1343 (11th Cir. 2008). If carried, the burden shifts onto the nonmoving party to point out a genuine dispute. *Boyle v. City of Pell City*, 866 F.3d 1280, 1288 (11th Cir. 2018). At this stage, courts view all facts and draw all reasonable inferences in the light most favorable to the nonmoving party. *Rojas v. Florida*, 285 F.3d 1339, 1341-42 (11th Cir. 2002).

When (as here) the parties file cross summary judgment motions, these principles are unchanged. *Bricklayers, Masons & Plasterers Int'l Union of Am. v. Stuart Plastering Co.*, 512 F.2d 1017, 1023 (5th Cir. 1975). The only difference is that courts must take care to view the facts most favorably to the nonmovant for each motion. *Chavez v. Mercantil Commercebank, N.A.*, 701 F.3d 896, 899 (11th Cir. 2012).

## DISCUSSION

To start, the Court addresses what the parties agree on: (1) there is enterprise coverage; and (2) the Individuals are employers under the FLSA. So the Court grants Creese's Motion in part on those two issues. What's more, neither party addresses Creese's claim for minimum wage violations (Count 2). Thus, the Court does not tackle it below.

## A. Motion to Strike

Before turning to the merits, the Court must decide whether it will strike parts of Gruber's declaration. It won't. Creese challenges the declaration on a host of grounds.

First, Creese challenges several statements as legal conclusions. The statements Creese highlights are barely objectionable (if at all). Gruber says the Department of Transportation ("DOT") regulates Bald Eagle. As Creese himself points out though, Bald Eagle is—by state law—subject to a host of DOT regulations. Fla. Stat. § 316.302(b); *see also* 49 C.F.R. § 383.3 (requiring intrastate drivers of some vehicles to have a CDL). What Creese is really getting at is saying Gruber's statements are not dispositive on the issue of an FLSA exemption. The Court agrees. But that is a separate matter addressed below. And if Gruber makes improper conclusions, the Court "is fully capable of ignoring such legal conclusions in performing [a] review of the summary

judgment motions." *Edmondson v. Caliente Resorts, LLC*, No. 8:15-cv-2672-T-23TBM, 2017 WL 8948389, at *4 (M.D. Fla. Apr. 7, 2019).

Second, Creese attacks a handful of statements because Gruber lacks personal knowledge. Many relate to his knowledge of Bald Eagle's clients and their relationships with the company. Creese's arguments all fall flat.

To start, Gruber is the owner and president of Bald Eagle. And he has been actively involved in the company's operations for over twenty-five years. In other words, if anyone has personal knowledge about Bald Eagle, its clients, and their relationships, that person is Gruber. *See United States v. Stein*, 881 F.3d 853, 858 (11th Cir. 2018) ("Rule 56(c) states only that an affidavit must be 'made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.'"). It seems Creese demands documented corroboration of Gruber's knowledge, but that isn't required. *Id.*

Creese's hearsay challenge to paragraph 7 is likewise unconvincing. Gruber's challenged statement does not seek to prove the truth of anything written in a contract. Confusingly, even Creese concedes "Gruber may be in a position to give first-hand testimony regarding the existence of Bald Eagle's contracts with motor clubs." (Doc. 51 at 11). But that is what the declaration says—Bald Eagle arranged or contracted with motor clubs to provide towing services to commercial vehicles. Again, Gruber may testify on Bald Eagle's

relationships with its clients if he has personal knowledge.  Like above, Creese is trying to litigate an exemption through a motion to strike.  And as stated, the Court will disregard any improper legal conclusions.  Relatedly, Creese challenges Gruber not attaching contracts with third-party motor clubs, it is a nonstarter.  Once more, Gruber's declaration does not seek to prove the content of a contract.

Finally, as to Creese's contentions on statements related to data provided in exhibits, there is no reason to strike.  As much as Creese questions Bald Eagle's failure to attach the documents, the argument flounders.  Bald Eagle offered the exhibits—along with the declaration—attached to summary judgment.  What's more, the declaration itself is clear to what records it refers for anyone familiar with this case.  And a later declaration removed any doubt. Finally, the records speak for themselves.  As Bald Eagle argues, they are business records and Gruber appears qualified to lay their foundation.  *See Meunier Carlin & Curfman, LLC v. Scidera, Inc.*, 234 F. Supp. 3d 1269, 1278 (N.D. Ga. 2018).  So the Court will consider the paragraphs, which records support.

The Court, therefore, denies Creese's Motion to Strike.

## B.  Motor Carrier Act ("MCA") Exemption

Turning to the merits, the Court first considers a potentially dispositive issue: whether Creese is an exempt employee.

Employers subject to the FLSA must pay employees overtime. 29 U.S.C. § 207(a)(1). Yet the FLSA's overtime provision "does not apply with respect to all employees." *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 147 (2012). "Under the MCA exemption, workers are exempt from the FLSA overtime requirement if the United States Secretary of Transportation is authorized to set their maximum hours." *Ehrlich v. Rich Prods. Corp.*, 767 F. App'x 845, 847 (11th Cir. 2019); 29 U.S.C. § 213(b)(1). For years, courts narrowly construed FLSA exemptions against employers. *A.H. Phillips, Inc. v. Walling*, 324 U.S. 490, 493 (1945). That's no longer the case. *Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1142 (2018). Still, employers bear the burden to establish an FLSA exemption. *Klinedinst v. Swift Inv., Inc.*, 260 F.3d 1251, 1254 (11th Cir. 2001).

The MCA exemption presents a mixed question of law and fact. *Williams v. Cent. Transp. Int'l, Inc.*, 830 F.3d 773, 775 (8th Cir. 2016). "The question of how [Creese] spent his time working for [Bald Eagle] is a question of fact; the ultimate issue of whether his work activities exempted [Bald Eagle] from paying FLSA overtime is one of law." *Id.*

For some "motor carrier" employees, the DOT Secretary may set the "maximum hours of service." 49 U.S.C. § 31502(b). The Secretary's jurisdiction extends to "transportation by a motor carrier and the procurement of that transportation, to the extent that passengers, property, or both, are

transported by motor carrier" between states. 49 U.S.C. § 13501(1). The MCA "exemption applies only to those employees over whom the Secretary of Transportation has this authority." *Walters v. Am. Coach Lines of Miami, Inc.*, 575 F.3d 1221, 1227 (11th Cir. 2009)

The Secretary has authority over "employees who are employed (1) by a common carrier by vehicle; (2) engaged in interstate commerce; and (3) whose activities directly affect the safety of operations of such motor vehicles." *Abel v. S. Shuttle Servs., Inc.*, 631 F.3d 1210, 1213 (11th Cir. 2011) (citation omitted). So the Eleventh Circuit applies a two-part test:

> First, [the] employer's business must be subject to the Secretary of Transportation's jurisdiction under the MCA. Second, the employee's business-related activities must directly affect the safety of operation of motor vehicles in the transportation on the public highways of passengers or property in interstate or foreign commerce within the meaning of the [MCA].

*Walters*, 575 F.3d at 1227 (cleaned up). The Secretary "does not have to exercise the authority granted . . . by the MCA for the motor carrier exemption to be applicable." *Id.* at 1226. Rather, the "power to regulate under the act merely needs to cover a particular group of employees." *Id.* The exemption, thus, "depends both on the class to which [an] employer belongs and the class of work involved in the employee's job." 29 C.F.R. § 782.2(a).

The parties seemingly agree Creese's work directly affected the safe operation of motor vehicles on public highways. Their disagreement boils down

to whether Bald Eagle and Creese's tows within Florida constitutes interstate commerce. That requirement can impact both prongs of the *Walters* test. *Abel, 631 F.3d at 1215*. Because there is a genuine dispute of material fact on the interstate commerce question, summary judgment for both sides is misplaced.

Let's start with what is undisputed. Bald Eagle only tows vehicles within Florida. In fact, it registered with DOT for only intrastate tows. Unsurprisingly then, all Creese's work was within Florida (mostly in Southwest Florida). This may suggest an open-and-shut conclusion Creese did not engage in interstate commerce. But the law is more nuanced. "Even purely intrastate transportation can constitute part of interstate commerce if 'it is part of a continuous stream of interstate travel,' meaning there is 'a practical continuity of movement between the intrastate segment and the overall interstate flow.'" *Ehrlich, 767 F. App'x at 848* (quoting *Walters, 575 F.3d at 1229*). In other words, Creese's activity may have been part of interstate commerce despite him never crossing a state line.

When viewed most favorably to each nonmoving party, the record does not establish either is entitled to judgment as a matter of law on the MCA exemption.

Bald Eagle offers evidence showing about seven percent of Creese's tows were commercial vehicles registered in other states. In all, Creese towed vehicles with out-of-state plates 467 times. Of those jobs, sixty-eight were

cargo trucks.[3]   According to Popoff, the vehicles of at least one regular commercial client were in transit from Michigan.  (Doc. 44-1 at 34-35).  What's more, Bald Eagle arranged to provide towing services for nationwide motor clubs that serve out-of-state commercial vehicles.  From this evidence, a jury could reasonably infer Creese's work involved more than *de minimis* towing of vehicles during their interstate trips.  Stated another way, the jury could decide Bald Eagle was part of a "continuous stream of interstate travel," ensuring people or goods continue their interstate journey despite unplanned breakdowns during transport.  *See Walters*, 575 F.3d at 1229 (citation omitted).

Creese claims evidence supporting these facts is not in the record, but he is mistaken.  Bald Eagle provides the data for all (or nearly all) Creese's tows. Together, an exhibit and spreadsheet include information showing vehicle type (VIN, make, model, and year), its license plate, and association with a corporate account.  Put another way, Bald Eagle has data to support its contentions.  And the strategy to ignore or exclude that evidence falls short. Likewise, the argument that Bald Eagle's activity was unexpected or unintended fails.  No vehicle is immune from mishaps.  Presumably for that reason, motor clubs have relationships with Bald Eagle to provide towing services for members travelling in Southwest Florida.  If those vehicles are in

---

[3] This data is from Gruber's declaration (Doc. 44-5), which relies on data on the docket (Doc. 44-2) and provided to the Court in electronic copy.

interstate transit, Bald Eagle's services become essential to ensure the "practical continuity of movement between the intrastate segment and the overall interstate flow." *Id.* (cleaned up).

That said, Bald Eagle's evidence does not—on its own—establish the identified tows were vehicles traveling interstate.  As Creese points out, perhaps some (or even all) of those trips were commercial vehicles moving only within Florida that simply happened to be registered in another state.  Because Bald Eagle never collected information on where vehicles were coming from or going to, it cannot say with certainty what percent were engaged in interstate commerce.  Rather, it is a matter of inference.  At a deposition, Creese highlighted this by identifying the tow of a rental car, which may have only been used locally.  (Doc. 44-1 at 29-31). For those reasons, the Court agrees with Creese it cannot grant Bald Eagle summary judgment on the MCA exemption.  *See Swan v. Nick Grp., Inc.*, No. 1:11-cv-1713-WSD, 2013 WL 5200508, at *4-5 (N.D. Ga. Sept. 13, 2013).  But at the same time, the Court disagrees Bald Eagle did not present enough evidence to survive Creese's effort to get judgment on this matter.  *See Johnson v. Hix Wrecker Serv., Inc.*, 651 F.3d 658, 663-64 (7th Cir. 2011) (holding even though employer's affidavit did not establish entitlement to MCA exemption, it was enough to survive summary judgment).

In short, there is a genuine issue of material fact over the MCA exemption. Both parties want summary judgment in their favor. But a reasonable jury could find for either. Viewing the evidence and taking reasonable inferences in a light most favorable to each nonmoving party, the Court denies both Motions on the issue. *See* 10A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2725.2 (4th ed. 2021) ("Therefore, if the evidence presented on the motion is subject to conflicting interpretations, or reasonable people might differ as to its significance, summary judgment is improper." (footnotes omitted)).

## C.  Creese's Motion on Liability

Considering that conclusion, the Court must deny Creese's Motion to the extent that it seeks partial judgment on FLSA violations. *See Rich v. Sec'y Fla. Dep't of Corr.*, 716 F.3d 525, 530 (11th Cir. 2013). To be sure, it is not Creese's burden to disprove Bald Eagle's defenses. Yet because there is a genuine dispute on the MCA exemption, it would be impossible to rule Creese is entitled to judgment when the jury still needs to decide if the FLSA applies to him at all. 10B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2734 (4th ed. 2021) ("Since a single valid defense may defeat recovery, however, a claimant's motion for summary judgment should be denied when any defense presents significant fact issues that should be tried.").

As this was the last matter addressed in Creese's Motion, the Court resolves Bald Eagle's remaining arguments below.

## D. On-Call Time

The FLSA demands employers pay nonexempt employees for "all hours worked." 29 C.F.R. § 778.223(a). And an employer cannot "suffer or permit" an employee "to work" more than forty hours a workweek without paying time and a half. 29 U.S.C. §§ 203(g), 207(a)(1). Bald Eagle seeks to clarify the scope of hours for which Creese is entitled to pay. In other words, it wants a ruling that the time Creese spent on call—but not working—is not compensable. The Court agrees with one caveat. While Creese is entitled to pay for hours worked while on call, he has no right to pay for hours spent waiting between calls outside his regularly scheduled work time.

To start, it is necessary to dispel Creese's notion that he was always considered on duty, which means all hours were work time. Without a doubt, a tow call could come at any time. But Creese provides no evidence that he was actually on duty every hour for almost three years (as he argued at summary judgment) or even nineteen hours a day (as he testified to and estimated for his hours). Confusingly, Creese admitted to spending long periods of time at home—not working—on weekends. Likewise, he does not seek to recover time spent sleeping because he recognized it was not work time. So it is clear Creese was not always on duty for FLSA purposes. Even if he

were, the inquiry to determine his hours would be like the one employed for

on-call time.  *See* 29 C.F.R. § 785.15.  So the Court turns to that analysis.

On-call employees may be entitled to pay for the time they spend waiting.

*Armour & Co. v. Wantock*, 323 U.S. 126, 134 (1944).  Traditionally, the

distinction has been whether an employee "was engaged to wait" or "waited to

be engaged," with only the former compensable.  *Skidmore v. Swift & Co.*, 323

U.S. 134, 136 (1944).  Deciding whether an employee is working during on-call

time "depends on the degree to which the employee may use the time for

personal activities." *Birdwell v. City of Gadsden, Ala.*, 970 F.2d 802, 807 (11th

Cir. 1992).  In other words, "whether 'the time is spent predominantly for the

employer's benefit or for the employee's.'" *Id.* (quoting *Armour*, 323 U.S. at

133).  To determine if time is compensable, courts scrutinize "the agreements

between the particular parties, appraisal of their practical construction of the

working agreement by conduct, consideration of the nature of the service, and

its relation to the waiting time, and all of the surrounding circumstances."

*Skidmore*, 323 U.S. at 137.

If "a particular set of facts and circumstances is compensable under the

FLSA is a question of law for the Court to decide." *Llorca v. Sheriff, Collier

Cnty., Fla.*, 893 F.3d 1319, 1324 (11th Cir. 2018).  So "it is for the court to

determine if a set of facts gives rise to liability; it is for the jury to determine if

those facts exist." *Dade Cnty., Fla. v. Alvarez*, 124 F.3d 1380, 1383 (11th Cir. 1997) (cleaned up).

While not controlling, regulations interpreting the FLSA address "on-call time":

> An employee who is required to remain on call on the employer's premises or so close thereto that he cannot use the time effectively for his own purposes is working while "on call." An employee who is not required to remain on the employer's premises but is merely required to leave word at his home or with company officials where he may be reached is not working while on call.

29 C.F.R. § 785.17.  The regulations explain on-call time spent at home.  Such time "may or may not be compensable depending on whether the restrictions placed on the employee preclude using the time for personal pursuits." 29 C.F.R. § 553.221(d).  "Where, for example, an employee . . . has returned home after the shift, with the understanding that he or she is expected to return to work in the event of an emergency in the night, such time spent at home is normally not compensable." *Id.*  "On the other hand, where the conditions placed on the employee's activities are so restrictive that the employee cannot use the time effectively for personal pursuits, such time spent on call is compensable." *Id.*  At bottom, for on-call time to be work time, an employee's use of the "time must be severely restricted." *Birdwell*, 970 F.2d at 810.

Here, the restrictions on Creese's time were not so severe that he was working 24/7 predominantly for Bald Eagle's benefit. Here's why.

From seven to five during business days, Creese had to be within the general vicinity of the Shop or Naples proper.[4] (Doc. 44-6 at 53-54). While the area was never defined, it was clear Creese could neither leave Collier County nor be near his home (about thirty to forty-five minutes from the Shop). Outside those hours, Creese could be called out for tows at any time. Those calls came to Creese's cell phone—provided by Bald Eagle—which Creese had to monitor constantly. Creese had to bring home his work truck, which he used as a personal vehicle. Other than response times (addressed below), there was seemingly no other restrictions on Creese's time.

This arrangement is a far cry from one that would convert wait time to work time. *See, e.g.*, *Birdwell*, 970 F.2d 802 (holding detectives not working even though they could not leave town, drink, or go anywhere with family in one car); *Bright v. Houston Nw. Med. Ctr. Survivor, Inc.*, 934 F.2d 671 (5th Cir. 1991) (holding time for employee always on call not compensable despite need to be reachable by pager); *Norton v. Worthen Van Serv., Inc.*, 839 F.2d 653 (10th Cir. 1988) (holding driver not entitled to pay despite needing to stay near premises for eight to ten hours per shift). Nor does Creese argue calls were so

---

[4] There is a genuine dispute on this fact. But the Court must view the evidence most favorably to Creese.

frequent he could not effectively use the time for his own benefit. *Cf. Smith v. Ideal Towing, LLC*, No. 1:16-CV-1359-TWT, 2017 WL 5467154, at *4 (N.D. Ga. Nov. 13, 2017) (holding tow truck drivers who could get fifteen calls each day could not use time for own benefit).

None of this considers the evidence showing Creese could use on-call time for his own benefit. For instance, he spent long periods of time on weekends at home with his family as he normally would have. (Doc. 44-6 at 175). And he could do things like go to the grocery store with his fiancée if they took separate cars (although he tended not to because call outs while shopping were inconvenient). (Doc. 44-6 at 75-76). Creese's work schedule may have been undesirable. But that does not somehow entitle him to pay for hours he did not work. *Birdwell*, 970 F.2d at 809-10 (noting a job can be "undesirable and perhaps oppressive" without on-call time being compensable).

As noted, Creese's response time needs a closer inspection. Creese tries to piece together disparate pieces of evidence to create a genuine dispute on whether Bald Eagle required him to "immediately" respond to calls or face discipline. The biggest problem is Creese testified otherwise: "I had to make sure that I was always available to go to a call within 30 to 45 minutes of when that call came in." (Doc. 44-6 at 187). None of the other evidence calls Creese's testimony into doubt or suggests Bald Eagle demanded any quicker response.

Creese's argument seems to be that because Bald Eagle provides around-the-clock emergency towing services, he had to respond immediately. But nothing suggests that was a restriction Bald Eagle placed on him. While he relies on an employee handbook, it does not demand any specific response time. Rather, it warns against the consequences of a consistent "poor response time."[5]  (Doc. 42-2 at 9).  And even though Creese points out an e-mail from Bald Eagle chastising employees for averaging one-hour responses, this does not alter Creese's testimony. To be sure, there were certain calls that required specific response times. For instance, law enforcement calls required a thirty-minute response. But again, that tracks Creese's statement. In sum, the evidence on response times did not impose a severe restriction on Creese's free time. *See Birdwell*, 970 F.2d 802 (immediate response); *Bright*, 934 F.2d 671 (twenty-minute response); *Norton,* 839 F.2d 653 (twenty-minute response).

This Court recently considered—and rejected—a similar claim. *Caiazza v. Marceno*, No. 2:18-cv-784-FtM-38MRM, 2020 WL 5892019, at *2-5 (M.D. Fla. Oct. 5, 2020).  Creese's attempt to distinguish the case misfires. The difference, says Creese, is that he needed to carry and check his phone. Yet that was the same situation in *Caiazza.*  2020 WL 5892019, at *1, 4 (Plaintiff "received call

---

[5] It is unclear how much of this document even applied to Creese. Certain provisions could not apply to his unique arrangement (e.g., "Drivers with poor response time will go to the bottom of the driver's rotation."). (Doc. 42-2 at 9).

outs on a cell phone. So [plaintiff] could leave his house to do other things in the area if he carried his cell phone."). That makes the cases similar, not different. What's more, Creese contends he had an immediate response time. As explained, that's just not true. And while *Caiazza* concerned a longer response time, Creese still cannot show his time was severely restricted. So, like *Caiazza*, this is a typical case in which an on-call employee allowed to go home is not paid for time spent there. 29 C.F.R. § 553.221(d).

The Court grants summary judgment to Bald Eagle as to Creese's theory he is entitled to pay for time not spent working while on call. To be clear, however, this ruling is limited to the time outside seven to five on weekdays. Creese contends he was scheduled for those hours and required to be in his truck at or near the Shop during that time. The parties genuinely dispute whether that was a requirement or if Creese even had a schedule. All that time (fifty hours per week) may or may not be compensable. *See Norton*, 839 F.2d at 655-56 (holding on-call drivers required to stay near employer's office not entitled to pay). Yet the parties did not sufficiently brief that issue. Rather, they briefed on-call time generally without differentiating between Creese's scheduled and unscheduled hours. On this record, the Court cannot address the distinction. So whether Creese was working and entitled to pay from seven to five every weekday will proceed to trial.

### E.  Burden of Proof

With the scope of hours clarified, the inquiry turns to Bald Eagle's theory Creese did not meet the burden to proceed.  This contention is a dud.

Ultimately, an employee bears the burden to prove she was improperly paid for overtime.  *Lamonica v. Safe Hurricane Shutters, Inc.*, 711 F.3d 1299, 1315 (11th Cir. 2011).  But the employer has the "duty to keep records of the employee's wages, hours, and other conditions and practices of employment." *Allen v. Bd. of Pub. Educ. for Bibb Cnty.*, 495 F.3d 1306, 1315 (11th Cir. 2007). So if the employer's records are untrustworthy or nonexistent and the employee lacks documentation, the employee's burden is relaxed.  *Lamonica,* 711 F.3d at 1315; *Allen,* 495 F.3d at 1316.

In such cases, an employee must prove uncompensated overtime and provide "sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." *Lamonica,* 711 F.3d at 1315 (quoting *Anderson v. Mt. Clemens Pottery Co.,* 328 U.S. 680, 687-88 (1946)).  If she can do so, the burden shifts onto "the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn." *Id.* (citation omitted).

The parties seemingly agree Bald Eagle's system for documenting service calls should reflect all (or nearly all) the tows Creese performed.  Yet they disagree whether those records reflect the full extent of time Creese spent

on tows.  He testified the system was flawed when it came to recording time because a dispatcher may need to enter information manually.  So the timestamps were misleading.  What's more, Bald Eagle's system only recorded hours for tows.  The records, thus, do not reflect all the time Creese spent estimating jobs, taking phone calls, responding to e-mails, training coworkers, or performing other tasks.  According to Creese and a coworker, these unrecorded hours were plentiful.  And while GPS records tracked the movement of Creese's work truck, those records also failed to capture work time spent doing nontow work.  In short, Creese's burden is relaxed because Bald Eagle's records do not reflect all work time.

Much of Bald Eagle's challenge revolves around Creese's inability to provide specifics on the exact number of overtime hours each workweek.  Such certainty is not required though.  *Allen*, 495 F.3d at 1317-18 ("Thus, it is clear that [defendant] was not entitled to summary judgment based on [p]laintiffs' lack of documentation and inability to state with precision the number of uncompensated hours they worked and the days on which that work was performed.").  Rather, if sufficiently detailed, a plaintiff's testimony on hours "regularly worked" may "allow the jury to approximate the hours" plaintiff "actually worked in each week." *Lamonica*, 711 F.3d at 1315; *see also Medrano v. Inv. Emporium LLC*, 672 F. App'x 944, 948-49 (11th Cir. 2016) (holding plaintiff's testimony—without "documentation or a specific recitation of his

hours worked"—was enough to withstand directed verdict). So the unpublished Eleventh Circuit cases Bald Eagle cites purportedly to the contrary are unconvincing. *See Jackson v. ThinkDirect Marketing, Grp., Inc.*, No. 1:16-cv-03749, 2019 WL 8277236, at *3 (N.D. Ga. Dec. 9, 2019) (distinguishing the line of cases Bald Eagle relies on because plaintiff alleged the type and amount of work). And Creese simply needs to provide enough to support a reasonable estimate of hours. *E.g.*, *Wagner v. Lee Cnty.*, 678 F. App'x 913, 926 (11th Cir. 2017). At this stage, he did so.

As mentioned above, there is still a dispute whether Creese worked fifty scheduled hours every week. If the jury believes him, then Creese worked at least ten hours of unpaid overtime a week. That does not include the time Creese spent working after five or on weekends. Some of those hours are documented in Bald Eagle's records of Creese's tows. In other words, Creese carried his burden to show he worked overtime without pay and can reasonably estimate at least some of those hours. At trial, Creese will need to establish a reasonable estimate on the total overtime sought—which should change given the on-call ruling above. But Bald Eagle's challenge goes more to its own burden (once shifted) to negate the reasonableness of Creese's inference.

At bottom, granting summary judgment would require disregarding Creese's testimony (along with a coworker's declaration) on the hours he worked. Of course, that would be improper. To be sure, Bald Eagle lists a

litany of reasons to doubt Creese.  It very well may be right, and can bring out that evidence at trial.  But summary judgment is not the time to weigh evidence or determine credibility.  That's the jury's job.

## F.  Vacation Pay

Finally, the parties dispute whether Creese has a right to vacation pay.  Count 3 alleges Bald Eagle owes those wages under Florida Statute § 448.08.  Bald Eagle disagrees.  So does the Court.

The statute Creese relies on "does not create an action for unpaid wages." *Hamann v. Little Italy's Meatballs, LLC*, No. 8:20-cv-2589-VMC-AEP, 2021 WL 1931257, at *4 (M.D. Fla. Mar. 31, 2021), *report and recommendation adopted*, 2021 WL 1541086 (Apr. 20, 2021).  Instead, it permits prevailing party costs and attorney's fees in unpaid wage actions.  Fla. Stat. § 448.08.  Still, many courts interpret this theory as a simple claim "for unpaid wages under Florida common law." *Perez v. Mediglez Wellness Ctr., Inc.*, No. 8:12-cv-2751-T-33EAJ, 2013 WL 5566183, at *4 (M.D. Fla. Oct. 8, 2013) (cleaned up).

"Florida law broadly construes wages within the meaning of § 448.08 to include all compensation paid by an employer for the performance of service by an employee." *Short v. Bryn Alan Studios, Inc.*, No. 8:08-CV-145-T-30TGW, 2008 WL 2222319, at *3 (M.D. Fla. May 28, 2008) (collecting cases).  So many forms of earnings, such "as accrued vacation pay, are considered 'wages' for purposes of" the statute.  *Id.*

The parties apparently agree Creese is entitled to his 2019 vacation pay (through their e-mail contract) if he reached the accrual date. They dispute the date though. Creese argues the accrual date was every June, when he signed the contract modifying his compensation package. Bald Eagle contends that date falls in September, which is his new-hire anniversary date.

The contract says, "$2,600 would be added to your gross annual pay of $67,600 if you did not take time off." (Doc. 44-5 at 1). In other words, the contract is ambiguous on the accrual date. Like Bald Eagle argues, the circumstances and conduct make clear vacation pay accrued on Creese's anniversary date. *See Hibiscus Assocs. Ltd. v. Bd. of Trs. of Policemen and Firemen*, 50 F.3d 908, 919 (11th Cir. 1995) ("However, when a contract term is ambiguous, the best evidence of the parties' intent is the construction the parties themselves put on the agreement through their conduct.").

Bald Eagle paid out Creese's vacation bonus in November 2017. (Doc. 44-7 at 9). This was only five months after signing the contract. Creese makes no effort to explain how his annual vacation bonus could have accrued and been paid at that time unless the accrual date was in September. Rather, the parties obviously intended their contract to modify the vacation pay provision set out in the employee handbook. That clause awarded vacation pay after years of "continued" or "completed" employment. (Doc. 42-2 at 4). Put another way, the bonus accrued on the anniversary date.

What's more, as Bald Eagle points out, accepting Creese's argument would ignore reality. Creese worked at Bald Eagle for less than three years. During that time, he earned two annual vacation bonuses—in November 2017 and 2018. Unless Creese discovered a time warp, there is no chance he earned three annual bonuses in just over two years (i.e., June 2017 to June 2019).

At bottom, the accrual date for Creese's vacation pay was in September 2019. Because he did not reach that date, he is not entitled to those wages. And summary judgment for Bald Eagle is proper on Count 3.

Accordingly, it is now

**ORDERED:**

(1) Plaintiff's Motion for Summary Judgment (Doc. 42) is **GRANTED in part**.

    a. Defendant Bald Eagle is an "enterprise" as defined by the FLSA.

    b. Defendants Dewayne Gruber, Buddy Hager, and Daniel Popoff are "employers" as defined by the FLSA.

    c. The balance of the Motion is **DENIED**.

(2) Defendants' Motion for Summary Judgment (Doc. 44) is **GRANTED in part**.

    a. As to Plaintiff's theory of entitlement for on-call time, Counts 1 and 2 are—**in part**—**DISMISSED with prejudice**.

      b.  Count 3 is **DISMISSED with prejudice**.

      c.  The balance of the Motion is **DENIED**.

(3)  Plaintiff's Motion to Strike (Doc. 51) is **DENIED**.

**DONE** and **ORDERED** in Fort Myers, Florida on July 2, 2021.

SHERI POLSTER CHAPPELL
UNITED STATES DISTRICT JUDGE

Copies:  All Parties of Record